Resources we can get to case 20-20-23-29 Moderna v. Arbutus  Thank you. You will tell us, with respect to standing, how this case differs from the first one, however we rule on the first one. May it please the Court, this case involves the 069 patent held by Arbutus, which was the subject of a separate IPR from the ones we just discussed. Again, this is an IPR that was infected with legal error, but based on the Court's guidance, I'll begin with the standing issue. There are common issues with the appeal we just argued, but the circumstances were different at the time the 069 appeal was filed, because at that time the COVID vaccine was in development, Phase I, Phase II trials were underway, and before the appeal was filed, there actually had been a contract entered with the government to distribute the vaccine in the event it was approved. And since that time, of course, further development has occurred. What's in the record, obviously, because the BLA was filed after 2019, so what's in the record to support the prior development of this vaccine? There's substantial evidence in the Ryan Declaration about activities that were going on before September of 2020. At that time, there was Phase I, Phase II trials, they had developed the target, they developed the vaccine, and they were in the process of seeking and obtaining emergency authorization, which did happen after the appeal was filed, but substantial activity toward that end. So you're saying they were seeking, they sought emergency authorization before 2019? No, I'm sorry, we're talking now about September of 2020. So this appeal, the 069 appeal, was filed later in September of 2020. I'm sorry if I misunderstood. So it was already, they'd already sought the authorization even though they hadn't filed the BLA? Correct. So the emergency authorization was sought first, and that was obtained in December of 2020. Just to make sure I'm clear that the 069 appeal was filed later than the 435 that we just And at that time, there was extensive activity ongoing with respect to the COVID vaccine. By that time, Moderna had begun manufacturing the COVID vaccine for commercial sale, they had begun enrollment in Phase III clinical trials, and Phase I results had been published. They had entered into a supply agreement with the Department of Defense as of August of 2020. All that had occurred by September 30th of 2020 when this appeal was filed. So this is more than enough to establish the concrete injury. The DuPont case, which is relevant to both standing and the merits, addresses this issue. And in that case, the company had just begun operating a plant that could make a product that could possibly infringe, and that was deemed enough for standing. And here, the activities with respect to the COVID vaccine were much further along. So it is differently situated from the 435 appeal in that sense. In the 435 appeal, these facts help support ongoing live controversy. But for this 069 appeal, they meet the standard of concrete injury, the risk of a possible infringement action. Again, we don't need to concede infringement. There doesn't need to be a specific threat of an infringement action. But there's extensive activity at the time the appeal was filed. And that activity was protected, right? That activity was protected from immediate suit, but that's not the standard. And in fact, the Altair case, which we cited in our briefs, was a much more attenuated situation where standing was found. There, there was concurrent litigation about an NDA obligation that the parties had. But the court found that if that were resolved in favor of the developer, they would file an ANDA, which would then lead to, inevitably, an infringement case. So it doesn't have to be that someone can be sued on the very day the appeal was filed. There has to be a risk of possible infringement action. That can be based on both concrete current and potential future activity. Concrete plans. What is the evidence for the concern of an infringement suit? The broad statements that we've cited in our briefs and attached to Mr. Ryan's declaration that Moderna, that Norbutis believes it covers the entire landscape of lipid nanoparticles. There are lipid nanoparticles in the COVID vaccine. That is enough. They've studiously avoided, as Mr. Ryan, as our brief says, they've studiously avoided an accusation of infringement, but that's not enough to avoid standing. The reality is they could bring a lawsuit. There's also no covenant not to sue, right? Exactly. Paragraph 11 of Mr. Ryan's declaration makes that clear. In the context of broad conversations about potential licensing of more rights than we have referred to in the prior argument. They could sue us the day after this appeal is resolved, and that can't be what's intended by the jurisprudence on standing. There's concrete activity, both current and potential future activity related to the COVID vaccine that Arbutus could bring a lawsuit about, and they've never said they won't. They have not stipulated- Was there a request for a covenant not to sue? It came up in the discussions, and that is addressed at Mr. Ryan's paragraph 11. They have not stipulated to infringement, and again, in the Altair case, that was one of the factors the court considered in finding that standing was there. They have never retracted their broad statement about the patent rights here, and they have never indicated that they will not proceed with a case against Moderna. The fact that they haven't made a specific threat is not enough to undermine standing here. There's extensive activity relating to the vaccine, and I should add that the licenses that we talked about with respect to the 435 patent are still in play and still could lead to future development and sub-licensing, but that's certainly less concrete than the ongoing COVID vaccine activity. Want to get to the merits? Yes. This is a case where DuPont is squarely on point. That was an IPR where the board had found non-obviousness, and this court reversed finding that they failed to apply the proper legal framework because they failed to shift the burden upon showing of an overlapping range, and that is exactly what happened. Why is this case different in that, well, first of all, the board said the presumption doesn't apply because you have to make certain assumptions in order to be able to reach the claimed phospholipid range. You need to make certain assumptions about other amounts of other components, and so that it wouldn't have been obvious to make that assumption. And secondly, this is a two-part question, where the board said even if the presumption applied, leave below for all the reasons why it would be rebutted. So I'll take those questions one by one. In terms of the failure to apply the presumption, it's incorrect that assumptions need to be applied. There's four lipids. Four lipids are disclosed in the prior art, including both the cholesterol and phospholipid components. Almost all the examples in the prior art we're relying on have four lipids and have a phospholipid. The prior art discloses specific ranges in words, in those words, for three of those four components, cationic, non-cationic generally, and cholesterol. So we know, and it's undisputed, that the total four lipids have to add up to 100% concentration. You know what your friend on the other side is going to say, because he said it in the last appeal, which is these things all have to work together, and the failure to disclose some of the elements is itself sufficient to rebut your argument. So two responses to that. First of all, these are disclosed, because Arbutus chose in these prior art patents to disclose lots of different ranges. Presumably they did that for a reason, so that they could, if they wanted to in that patent family, make different claims with different ranges that they had disclosed in their written description. Instead, they came and tried to claim those things in a subsequent patent with a later expiration date, and that's a simple attempt at patent life extension. They chose to give these multiple ranges, including the 60% cationic lipid range. And we're not applying assumptions, because all those ranges are disclosed, and if you have a disclosure of what the non-cationic amount is in total, and what the cholesterol amount is in total, which is exactly the case here, it's basic math, and a person of ordinary skill understands how to come up with that range. We did that math in our brief, but it's simply A plus B minus A equals B. And that is disclosed. It may not be written in the words a range of, you know, 3 to 15%, but it's disclosed because you simply have to do the subtraction. And do I understand you to be disagreeing with the board's statement that you had to That is a disclosure, so it's not an assumption. They were the ones who chose to put the 60% number in their patent. That number, among others, is a range. So you're saying we have to assume that they would pick the top of the range in every single case to do the math, to make the math work. The range is disclosed, and the entire disclosure is what needs to be considered for obviousness purposes. This is not an anticipation case. The prior needs to be looked at for everything it discloses. There's different ways one could mix and match these numbers, but all of the numbers are there. Are you talking about obviousness aside from the presumption from ranges, the range presumption? Are you saying the range presumption need not apply? I'm having a hard time following your argument because I understand what you're saying about how 60 is one thing that's disclosed, but you're trying to get a particular legal presumption to apply to your claims, and there are specific conditions that have to be met. And so you want to pick part of the range in order to make the other ranges work. Why does that make sense when we're talking about a presumption here? That's exactly what the law requires. I don't think the law requires that you get to pick a particular amount for one amount for one ingredient in order to then meet the range adding up to 100 for another ingredient. It establishes that a slight overlap in ranges, that's the direct quote, creates a presumption of obviousness. Here they chose to disclose a number of different ranges. That was their choice, but we're entitled to rely on any one of them to show overlap, and there doesn't need to be verbatim words in their prior art patent saying a phospholipid range of X to Y if a person of ordinary skill can understand how to get to those numbers based on everything else that is disclosed. Could you address my other question, which was the alternative? The board said even if it applies, that they conclude that the phospholipid is not a result-effective variable. They had a lot of other fact findings, too. How do you respond to that? That was a further compounding of their initial error because they purported to do the analysis in the alternative, but instead of putting the burden on Arbutus where it needed to be upon a presumption of obviousness, they faulted Moderna for failing to establish A, that the amount of phospholipid was recognized as result-effective, B, that there would have been motivation or routine optimization. And I can provide quotes from the opinion of the final written decision where they did that. At appendix 25, this is the final written decision, they said the presumption is rebutted because we find nothing in the evidence indicating that the amount of phospholipid was recognized as result-effective. It should have been Arbutus' burden to prove not that it was result-effective, but it was not. What do we make of the fact that they're optional in the formula? Optional does not mean that they cannot be considered part of the prior art. We cited cases to that effect. If they're disclosed, they're part of the prior art. And the problem from a legal framework standpoint is that once that overlapping range was established, even as plain overlap, the burden should have shifted to Arbutus to either prove as a matter of burden of production that the range was too broad somehow to apply this presumption. The board did not require them to do that. To prove that somehow there would have been no motivation to routinely optimize, the board put that burden on Moderna, and that was the wrong party to have the burden. And most importantly, on the result-effective, they completely bollocked up the framework because what the law says, what the cases say, including DuPont and Applied Materials, is once that presumption's established, it's incumbent upon the patent owner to come forward and show that the variable was not result-effective. The board instead found that Moderna failed to prove that it was result-effective, and that's completely contrary to what the law requires. So their alternative analysis that your honor asked about was all based on applying the burden to Moderna when the presumption should have shifted that burden to Arbutus. Counsel, your time is almost up, but we'll give you three minutes for rebuttal. Thank you. We'll hear from Mr. Burrell. Thank you, Your Honor. May it please the Court. I'll begin with standing and address any questions that the Court has. I would observe here that the threats on which Moderna relies here are entirely stale. They were made in 2016, 2017, before COVID even existed. The evidence that Moderna has put into the record indicates that since that time they have changed their technology, and they say the patents are no longer relevant to what they're doing with respect to COVID. Many times in cases like this, the parties arrive and one of them will say, I'll give you a covenant not to sue. We do that right now. We haven't seen that here. I mean, I recognize it puts you in a really awkward position, but I think we do have to take into account that there isn't a covenant not to sue here. Well, understand this. The issue is what my client has done, what its actions are, not what its actions were not. And so the Prasco versus Medici case, as well as the AIDS global health case, both stand for the proposition that a refusal to grant a covenant not to sue is not enough to trigger jurisdiction. Well, does it enough, combined with the other things, including the stale statements, to trigger it? The statements are more stale than the stale statements that have defeated jurisdiction in other cases. For example, the Citizens Electronics case, it was a situation where they had made real threats. They said, we're not going to tolerate infringement. We're going to file lawsuits against unauthorized users. And then six months passed since those statements were made, and the court said even if those statements could have triggered jurisdiction when made, the passage of time, their six months, your many years, refused. But weren't the statements so broad that they said that all of their activity in this field would be covered by the patents that already existed? Well, I don't think they can be read that broadly, first of all. And second of all, they couldn't have predicted the future. Moderna, through Mr. Ryan, has advanced evidence in this record that says we changed our process, and we have an old process for which the patents are relevant, and we have a new process for which the patents are not relevant. We heard that again today with respect to their RSV vaccine, and the latest information they provided here to the court was that their new RSV technology uses the same technology as their COVID vaccine, indicating, per Moderna's own evidence, that the patents are somehow not relevant. So they're stale because Moderna says that they're stale. The world has changed, and they say it no longer applies. So the notion that they can rely on old statements, and at the same time suggest that everything has changed, and so old statements about old technology aren't pertinent anymore, that just doesn't hold together. They point to no evidence at all that we've made any threat with respect to the COVID vaccine, which is the only product on which they are relying for jurisdiction in this 069 case. We heard nothing again about the RSV vaccine. So as of the date of appeal, which is September 2020, they point to no activity that's not stale from my client, and a refusal to give a covenant not to sue under the law is never enough, and it's not enough here. With the court's permission, I'll be happy to turn to the merits of the appeal in the event that the court does not dismiss it. Can you focus on the burden-shifting argument? Absolutely. So first, it is a requirement of every one of these cases that the prior art disclose overlapping ranges. That's what DuPont says. That's what Peterson says. Even the other cases they cite, like Ormco and Galderma, they all require an actual disclosure of all of the overlapping ranges in the claim. That's missing here. The board found as a factual matter that that's missing here, that Moderna's evidence relied on all sorts of assumptions which were rejected by the board, including that the ranges address a four-lipid system with these four components and only these four components. It's not true that a non-cationic lipid must only be cholesterol and a phospholipid. The prior art discloses sterile amines, dodecyl amines, steroids, and numerous other non-cationic lipids. So the notion that you can just sort of divide it in the way that they assert is, number one, not true. Number two, rejected by the board in a finding that Moderna does not dispute. The board says it, 25 and 26. Moderna assumes that the entirety of the ranges disclosed apply to the four-lipid system. That was rejected, and without that assumption, this math doesn't hold together. I would further observe that what Moderna is doing is not suggesting  When they pluck out 60% for the cationic lipid for their calculation, and to be clear, every one of the calculations in their petition at 133 and 134 requires this assumption. But if you're talking about obviousness as opposed to anticipation, why wouldn't it have been obvious to pick the top of the range? Well, there was a lot of evidence that it wouldn't have been obvious, that higher amounts of phospholipids, of cationic lipids, would have been considered deleterious. But you look at the chart that even you produced, and it shows that the dip, the other side of the curve, occurs after 60%. Well, that's one chart. That's the Lin reference that Your Honor is speaking to. There was copious amounts of evidence in the prior art. The Gao prior art reference, to take one example, Semple, to take another. The analysis provided at A3365, which explains that where you have high cationic lipids, especially without high conjugated lipids, it would have been expected to be toxic, unstable, and the person of ordinary skill never would have done that. Ahmed says it's fine up until 60%. Ahmed actually... It helps up to 60%. Well, what Ahmed actually says, and the Board quotes this from Ahmed at page 15 of its opinion, is that it's more desirable to use less cationic lipids. In fact, the entire purpose of Ahmed's experiment... Right, but they're less versus more is 60 and less versus over 60. Well, first of all, Ahmed's lipoplexes were very different than those. So the percentages that attend to a lipoplex that has only cationic lipid and phospholipid and nothing else is not pertinent to the 4-lipid system, which the Board found was far more complex, where all of these components interrelate to each other. And we presented an enormous amount of evidence. If you look at 1710 through 1714, 1740, 1748, over and over again explaining that high cationic lipid was a bad idea and the person of ordinary skill would have thought that's toxic. But what is your definition of high? That's what I'm trying to understand. Anything for the higher end of the range. Anything over 50% is what the evidence explained. And certainly anything close to 60 would have been a nonstarter for the person of ordinary skill. And again, Judge Stoll's point that what you're trying to do here is not sort of show the claim is obvious through a normal rubric. Moderna is trying to apply a presumption that requires a disclosure of a phospholipid range. And there is no support in the law for picking and choosing by hindsight certain percentages from ranges and then constructing through some calculation a phospholipid range. The very prior art on which they relied, the 196 patent, says that the preferred range for cationic lipid stops at 45%. The same prior art reference says that the preferred amount of conjugated lipid is 4 to 15%. They ignore all that and they say let's choose another number. Why? Because 4 to 15% is outside of our claim. So they just choose another one by hindsight without explanation in a manner that's rejected by the board. There is no support in any of the cases to do this. The only cases they cite to support the proposition that they don't need an actual disclosure of a range of phospholipids are Ornco, which had an explicit disclosure of a 14 to 21 day period in the prior art and the claim was 2 to 20. And they also cite Galderma, where the Schrute prior art reference had an explicit range of 0.01 to 1%. There's no case that allows this calculation. And I would observe they did this calculation between their briefs and their petition six different times. Six different times in the two cases. And every time they came up with a different number. And I would submit that refutes the notion that the phospholipid range just sort of falls out of the sky to the POSA. One time they say 0 to 65. Next time it's 0 to 28. Next time it's 0 to 40. Next time in the 435 it's 0 to 20, which, by the way, is not anything like what they're asserting here, which is 0 to 19.5 and 0 to 30. So it's not true that the phospholipid range would have just been apparent to the POSA. They sort of admit sotto voce that it's not true by having six different calculations that create six different things. And it's based on unsubstantiated assumptions that the board rejected as a factual matter. And the notion that that's somehow not supported by substantial evidence is not true. I would also observe that the board found even if the phospholipid range had been disclosed, which, of course, it wasn't, and so the range law presumption could not be invoked, there were numerous factual findings that defeat a finding of obviousness under this court's range law jurisprudence, including the interaction between the various components, which there's been some question about whether one does that before or after the invocation of the presumption. Let me be clear here, because there's been a lot of confusion about that in the briefs here today. We don't have the burden to prove anything, whether one invokes the presumption or not. The law is clear, and Moderna agrees the burden of proof never shifts. It is always on the challenger, including in an IPR. The only burden we would have undertaken is a burden of production, not a burden of proof. And there's no question that in both this case and the 435 case, we met that burden of production. We came forward with an enormous amount of evidence showing non-routine optimization, showing interaction, and so that evidence is there. Declarations from Dr. Thompson, and I can list them all again if you'd like, but they're all there and they're cited in our brief, all of which the board was entitled to rely on. So whether the presumption was invoked, and then that information was considered after we discharged our burden of production, or whether it was never invoked in the first place, and honestly I read this court's law to suggest that it never should be invoked in the first place, where there's not routine optimization, given what this court said in Horizon, and given what it said in Genetics Institute, and what it said about Genetics Institute in footnote 15 of the DuPont case, where it suggests that the burden should not be invoked, where there are too many options and it would not be routine experimentation to get there. Either way, that's sort of angels dancing on the head of a pin, because we had the evidence. The board looked at all the evidence. The law says if the ranges are very broad, that's pertinent under the court's range analysis. The board considered that. The law says if the ranges interact with each other in an unpredictable way, in other cases, that's pertinent. The board looked at that. Whether the experimentation is routine or non-obvious invention, under Peterson, under Genetics Institute, the board looked at that and considered that, and time after time after time in both decisions, the board sided with us as a factual matter. And what Moderna is doing, it's unable to refute those factual determinations. It doesn't challenge a single one of them. So what it does instead is suggest that none of those factual determinations matter. Somehow there's this talisman of cases about ranges that uproots, root to branch, every fundamental tenet of this court's obviousness case law, from motivation to combine, to expectation of success, to routine experimentation, to interactive unpredictability. Those are the basic tenets from KSR in the 15 years since, as explained by this court. And the idea that you can just throw those out the window whenever you have an overlapping range is not well taken, and it's inconsistent with the very cases like Peterson and DuPont that they cite. I'm sorry, Your Honor. I wasn't asking. Okay. Looks like you were. Before you're done, I have one question that goes back to standing. And you argue that the fact of estoppel is meaningless, or pretty close to meaningless. We have said it's not enough, but it's not completely meaningless, right? The fact that they would be estopped under the 069, yeah. I mean, I think the JTET case, or however you pronounce that case, suggests that it's certainly not enough. And I think all of the jurisprudence would say the same thing. That's not something we have done. The crucial issue, Hunter Sandisk, is what has the patentee done? Has it made a threat? And so the fact that there could be some effect of estoppel as a result of the decision, not enough. The fact that we have not. Is it your view that they would, in fact, be statutorily estopped in both of these cases? They would be statutorily estopped under Section 315, but that doesn't mean that there's some imminent threat as of the time that they filed the notice of appeal of a lawsuit. And they haven't shown that. And they actually cited to Mr. Ryan's declaration at paragraph 8 and said, oh, that shows that these patents have some relevance to their payment obligations. And I would invite the court to look closely at what he said there and in his earlier declaration at 5745 through 46, where he said the 069 and 435 patents and other patents are relevant to our payment obligations. He never says that the 435 and 069 are themselves relevant. And he never says that it would remove an important obstacle so that the other 40 pages of patents would somehow not be relevant or would disappear. And I will read from Apple Qualcomm where it said, Apple nowhere provides evidence that the validity of any single patent, including the 037 and 362 that were relevant there, would affect its ongoing royalty obligation. Can I ask you one other question, which is I read Claim 7 of the 435 as being very similar to Claim 1 of the 069. Do you agree with that? I agree. I mean, it has the four lipids required, and there can be differences in terms of percentages. But as a fundamental matter, I agree with you, Your Honor. I think you've concluded. Thank you very much, Your Honor. Thank you, Mr. Burrell. Ms. Wigmore has three minutes for rebuttal. Thank you, Your Honor. Just starting briefly with standing, the word threat was used many different times in counsel's arguments, and I just want to make clear there's no requirement for a threat that has not been allowed, at least since Metamune. What is required for standing is that the appellant be engaged in or will likely engage in activity that would give rise to a possible infringement suit, and that is precisely the case here. There doesn't need to be a threat. As to Judge O'Malley's question about estoppel, the court has recognized in Phygenics and Consumer Watchdog that estoppel is not an injury, in fact, when the appellant is not engaged in any activity that would give rise to a possible infringement suit. But here we are, and therefore estoppel is relevant to the question of standing. As to the merits, I want to address the argument about so-called six different calculations. We disagree with that. First of all, some of those calculations related to the 435 patent, and there are different prior art disclosures and ranges involving the two patents, so that's not a fair assessment. In terms of the calculation... Is it fair for him to say that you came up with different numbers for the same calculations? There are, in fact, different numbers because there is a breadth of disclosure in the prior art. The main distinction between some of the numbers we provided, we provided two approaches. One is if you just look at the non-cationic range, which is in this case the phospholipid and the cholesterol. If you have the non-cationic range disclosed, and then you have the cholesterol disclosed, it's easy to do subtraction and figure out what the phospholipid would be. So that's one way of looking at it. Another way of looking at it is to look at all four ranges and to start with the 60% cationic, as we explained in our brief, and if you deduct the higher and lower end of the ranges disclosed for the other three components, you end up in the same place. So we're not giving different calculations. We're showing different ways to get there based on the disclosure and the prior art. Now, I want to turn to the burden because this was the board's fundamental error. Council discussed various evidence in the record, and we're not denying there's evidence in the record on both sides, but the problem is that the board put the burden on Moderna in the first instance to prove motivation, to prove the interdependence of the variables is not an issue. They should not have done that. We're not saying the burden of proof shifted. The burden of production should have shifted, and here the board improperly faulted Moderna's expert, Dr. Janov, for not presenting any arguments for why the skilled artisan would have been motivated to optimize. That should not have been our burden. That should have been their burden of production to which we could respond. Similarly, with respect to interdependence of the variables, the board committed legal error by faulting Moderna for not taking into account interdependence of the claimed lipid components. The in-ray applied materials case makes clear it's up to the patent owner after the presumption is established to show anything unpredictable or unexpected in the interaction of the variables. So the problem is not that there's no evidence in the record on either side. The problem is the lens through which the board viewed the evidence, and they consistently imposed the burden on Moderna to disprove these factors that the case law clearly establishes fall upon the patent owner to establish once the overlapping range exists. And so DuPont is squarely on point here. The board here made the exact same mistakes that were made in that case, and given the breadth of disclosure and the number of ranges that are very specific in the prior art, there is an overlap. The burden should have shifted, and this case should at the very least be remanded so that the board can view it through the proper lens. Thank you, Ms. Wigmore. The case will be taken on a submission. Thank you. Thank you for both of your arguments.